# In the United States Court of Federal Claims

No. 19-1668C
(Filed: June 10, 2021)

* * * * * * * * * * * * * * * * * * * * *

LAX ELECTRONICS, INC.
d/b/a AUTOMATIC CONNECTOR,

      *Plaintiff*,

v.

THE UNITED STATES,

      *Defendant.*

Bid protest; Cross-motions for judgment on the administrative record; Qualified Products List; Department of Defense Manual.

* * * * * * * * * * * * * * * * * * * *

    *Justin T. Huffman*, Auburn, NY, for plaintiff.

    *Reta E. Bezak*, Trial Attorney, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey*, Acting Director, and *Deborah A. Bynum*, Assistant Director, for defendant. *John J. Pritchard*, Senior Counsel, Defense Logistics Agency, of counsel.

## OPINION

    Plaintiff, LAX Electronics, Inc., doing business as Automatic Connector ("Automatic"), alleges that the Defense Logistics Agency ("DLA") improperly removed Automatic from a Qualified Products List ("QPL") to supply electrical connector parts to Department of Defense ("DOD") component clients. Plaintiff filed a motion for judgment on the administrative record, seeking a permanent injunction to be placed back on the QPL.  Defendant opposes the request and cross-moved for judgment on the record.  Oral argument was held on May 27, 2021.  Because the removal was neither procedurally deficient nor substantively irrational, we must deny plaintiff's request.

BACKGROUND

I.  Factual History

Automatic has supplied electronic connectors to the government for over 50 years as a supplier on the DLA QPL at issue.  As part of maintaining the approved provider list, DLA regularly conducts audits of QPL suppliers to ensure that the listed parts continue to meet military standards set by DOD and DLA.  The events in question center on a June 2019 audit of Automatic, which referenced an earlier 2016 audit.  Both are relevant to the challenged agency action and records of both were properly included in the administrative record.  One of plaintiff's general allegations here is that the 2019 audit was, in essence, pretextual because the same auditor had decided in 2016 that Automatic should be excluded from the QPL.  No evidence of bad faith was provided, nor did plaintiff pursue this avenue seriously in its papers.

During the 2019 audit, DLA flagged multiple major concerns and several minor ones.  One major concern was "Automatic chang[ing] a major process for machining parts without informing DLA," which, if disclosed, would have required Automatic to go through the requalification process.  Administrative Record ("AR") at 448.  Another concern of the DLA auditor was systemic traceability problems where Automatic lacked a process to track the components used in connectors through multiple stages of the manufacturing process.  *Id.*  Automatic also failed to properly document its testing of parts on the QPL, a repeat problem from 2016.  *Id.* at 450.  The final major concern was Automatic's failure to report to DLA orders of parts shipped for QPL jobs.  *Id.* at 451. The other significant concern highlighted in the audit report, although not a direct violation of the standards tested during the audit, was that Automatic had failed to document and could not show any record of implementing corrective actions that it told DLA it would accomplish following a 2016 audit.  *Id.* at 453.  During that audit, a stop shipment order was implemented by DLA due to problems the audit turned up.  The promised corrective actions were necessary before DLA would lift the stoppage.

The 2016 audit primarily concerned testing of Automatic's connectors.  *Id.* at 288–91.  As mentioned above, during the audit, a stop shipment of several of plaintiff's products was enforced by DLA.  Following the final report, Automatic was required to provide corrective action reports ("CARs") to address the problems found.  *Id.* at 291.  Following Automatic's

submission of its CARs, the corrective actions were accepted.[1]

On July 2, 2019, DLA once again sent a stop shipment letter to plaintiff due to the errors identified by the 2019 audit report. *See id.* at 457-58. As stated in that report, DLA required Automatic to provide CARs within 30 days, which were to describe how Automatic would address the problems found during the audit. AR at 456. On August 7, 2019, Automatic sent DLA seven CARs prepared by a consultant brought in to help with the problems uncovered by the audit. *Id.* at 462-78. Also on August 7, 2021, plaintiff sent a letter from counsel regarding the CARs and the stop shipment order, requesting dialogue regarding the problems and proposed fixes and asking DLA to lift the stop shipment order.[2] AR at 481-83.

On September 12, 2019, DLA removed Automatic from the QPL, informing plaintiff by letter dated that same day. AR at 519–20. DLA wrote that, based on the June 2019 audit results, Automatic had "engaged in a repeated and continuing course of conduct resulting in a significant number of program violations requiring its removal from the electronic QPL." *Id.* at 519. The letter then listed 11 failures that the audit found, including undocumented supplier changes, changes to product design without requalification, failures of testing and calibration, and a general failure "to comply with specification and standards traceability requirements for QPL

---

[1] To its reply brief, Automatic attached two letters it received from DLA after the 2016 audit. Both letters discuss Automatic's corrective actions for the errors found during that audit. The first letter, sent May 11, 2016, found that the deficiencies discovered during the audit had been corrected and lifted the stop shipment order. Pl.'s Reply Ex. 1. The second letter, sent August 15, 2017, clarified that it found the CARs to be acceptable and that DLA would review the corrective actions' implementation during their next audit of Automatic. Pl.'s Reply, Ex. 2. These documents are not part of the record, and plaintiff has not moved to supplement the record with them.

[2] The Amended Complaint also alleges that, on August 13, 2019, Automatic received a letter from DLA, requiring Automatic to issue a report through the Government-Industry Data Exchange Program ("GIDEP") to inform GIDEP participants of the problems with Automatic's QPL parts found during the June 2019 audit. Plaintiff also alleges that it responded by letter to DLA, arguing that a GIDEP notice would be premature given the lack of comment from DLA on Automatic's CARs. These documents were not included by the agency in the Administrative Record nor separately provided by plaintiff.

parts." *Id.* at 520.  Also noted as a reason for the removal was Automatic's refusal to issue a GIDEP notice. *Id.* at 519.  The letter provided, consistent with the Department of Defense Manual, that Automatic was afforded an opportunity to "respond and set forth any facts [it] deem[ed] relevant." *Id.* at 520.  An internal DLA memo explaining Automatic's removal, dated the same day, recorded that DLA considered the CARs sent by Automatic, but it did not rely on them because of the "repeat findings that occur during subsequent audits."[3] *Id.* at 522–23.  It is clear from this and statements in the audit report that the agency was particularly concerned with Automatic's history of problems and its lack of documented fixes.

Following Automatic's removal from the QPL, DLA sent plaintiff a letter on October 9, 2019, informing it that DLA would issue a GIDEP notice to inform participants of Automatic's non-compliance and violations.  That notice subsequently issued on May 29, 2020. *Id.* at 526.  Automatic did not respond to either the September or October 2019 notice.

## II.  Procedural History

Automatic responded to its removal by filing suit in this court on October 28, 2019.  The Amended Complaint made two claims. First, Automatic alleged that DLA violated multiple provisions of the Department of Defense Manual ("DoDM") Number 4120.24, Enclosure 14, when removing Automatic from the QPL. Specifically, Automatic alleged that DLA failed to consider Automatic's CARs before removing Automatic from the QPL.  Second, Automatic alleged that DLA violated FAR § 9.205(a) by not allowing Automatic sufficient time to re-qualify for the QPL and by failing to give notice of DLA's intent to establish a qualification requirement, including the "anticipated date that the agency will begin awarding contracts subject to the qualification requirement." 48 C.F.R. § 9.205(a)(4) (2020).

The government filed a motion to dismiss the complaint for lack of subject-matter jurisdiction. *LAX Elecs., Inc. v. United States*, 2019 WL 6880939 at *2 (Fed. Cl. Dec. 17, 2019).  We agreed in part, dismissing the first claim because it was untethered to an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement" as it was the result of an audit that was untied to any particular procurement or proposed procurement. *Id.* at *2 (citing 28 U.S.C. § 1491(b)(1) (2012)). Although finding jurisdiction over the second claim, we *sua sponte* dismissed

---

[3] This document was not provided to plaintiff until the Administrative Record was filed in this docket.

it for failure to state a claim because FAR § 9.205(a) concerns new qualifications imposed on offerors; it does not deal with offerors ousted from the QPL or those attempting to requalify. *Id.* at *4.

On appeal, the Court of Appeals for the Federal Circuit reversed the jurisdictional dismissal, holding that Automatic's removal from the QPL meant that it could not bid on future procurements, putting it within the Tucker Act's jurisdictional grant. *Lax Elecs., Inc. v. United States*, 835 Fed. Appx. 553, 558-59 (Fed. Cir. 2020). The appellate court affirmed the ruling on the second count regarding the FAR violation. *Id.* at 559. Following the mandate and remand, the government filed the administrative record, and the parties submitted the case on cross-motions for judgment.

DISCUSSION

When reviewing bid protests, we apply the standards set forth in the Administrative Procedures Act ("APA"). *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004). Unless the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," it will remain undisturbed. 5 U.S.C. § 706(2)(A). In other words, if the agency's decision was reasonable and not in violation of any law or regulation, then it meets the APA standard and will be upheld.

Automatic challenges its removal from the QPL, alleging that DLA violated multiple provisions of the DoDM by failing to evaluate and consider Automatic's CARs before removing it from the QPL. It also argues that the support for the agency's decision is lacking because there is neither record support for the idea that Automatic is a repeat offender for any particular violation nor is there evidence that it failed to implement its prior corrective actions. Plaintiff seeks to permanently enjoin DLA from (1) "barring Automatic from the QPL" and (2) "issuing any more contracts for parts that Automatic had listed on the QPL." Pl.'s Mot. at 14. At oral argument, plaintiff qualified its request by clarifying that it only sought to be reinstated pending a proper consideration of its CARs and that it did not seek to stop DOD from otherwise buying QPL parts prior to its restored ability to bid on procurements.

Defendant responds that the invocation of the DoDM is unavailing because it does not have the force of law and thus cannot serve as the basis for a protest. Furthermore, even if the manual does bind the agency, DLA followed the relevant provisions, argues the government. The government

5

also defends the removal decision generally as rational because it is supported by ample evidence of a considered agency decision.

We agree with defendant on all points, though the issue of the force and effect of the DoDM is something of a red herring because, although there is no indication that it was the product of notice and comment ruling making, it is the standard DLA attempted to adhere to. Thus, even though we agree with the government on the point, we consider below whether the agency met the procedural requirement anyway.

## I.  Department Of Defense Manual 4120.24 Does Not Have The Force And Effect Of Law

The Federal Circuit in *Hamlet v. United States* outlined a four-part test for when an agency's handbook or manual "is a regulation entitled to the force and effect of law."  63 F.3d 1097, 1105 (Fed. Cir. 1995).  It goes as follows:

> (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute.

*Id.*[4]  There is no real question that DOD has the authority to create procedures for the Defense Standardization Program, of which the DoDM is a part.  10 U.S.C. sections 2451–2452 give the Secretary of Defense the authority to create a standardization program for supplies for the Department of Defense.[5] The QPL is part of this effort.  In the introduction to the manual, it states that it is published "in accordance with the authority in DoD Directive (DoDD) 51340.1 . . . and DoD Instruction (DoDI) 4120.24 . . . to assign responsibilities and prescribe the procedures for implementing the [Defense

---

[4] Although the Federal Circuit in *Hamlet* applied this test to an agency's personnel manual, the Court of Federal Claims has applied this test to other types of agency materials.  *See,* e.*g.*, *Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 397–98 (2008) (considering whether a DOD and a DLA Acquisition Directive had regulatory effect).

[5] The standardization program is how the Department of Defense standardizes the supplies it uses. 10 U.S.C. § 2451(a) (2012).

Standardization Program] in accordance with sections 2451-2457 of Title 10, United States Code . . . ."  AR at 1.

That being said, there is no indication in the record or other legal authority cited by the parties that DOD followed applicable procedural requirements in order to give the DoDM regulatory effect.  The procedural requirements for promulgating regulations can be found in the APA at 5 U.S.C. § 552(a). Commonly known as "notice-and-comment rulemaking," the APA requires an agency to publish a proposed rule in the Federal Register, allowing time for the public to submit comments on the proposed rule. The agency will then take those comments into consideration as it develops its final rule.  The final rule is then published in the Federal Register.

The DoDM was published neither for comment nor permanently in the Federal Register.  The DoDM is published only on DOD's website.  The APA requires, however, that, "Each agency shall separately state and currently publish in the Federal Register for the guidance of the public . . . rules of procedure . . . ."  5 U.S.C. § 552(a)(1)(C) (2018).  We are aware of no exception that would apply to DOD procedures. [6]

DOD's informal publication on its website further suggests that the agency did not intend for the manual to have the force of law.  The Federal Circuit in *Hamlet* provided four factors to establish whether a promulgating agency intended to establish a binding rule: "(a) whether the language of the provision is mandatory or advisory; (b) whether the provision is 'substantive' or 'interpretive'; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent."  63 F.3d at 1105.

The language relied on by plaintiff in the DoDM is precatory, not mandatory. The procedural provision that Automatic cites as having been violated is DoDM 4120.24, Enclosure 14, § 12(b)(1), which states that a contractor's products "*should* again be included on the electronic QPL… once the deficiencies noted have been corrected to the government's satisfaction." (emphasis added). As *Hamlet* and multiple other cases have recognized, when a provision establishes that the government "should" do

---

[6] In *Hamlet*, the handbook' promulgation met procedural muster despite not following the APA's requirements because the statute specifically exempts personnel materials from its ambit.  63 F.3d 1097, 1105 n.6 (Fed. Cir. 1997) (citing 5 U.S.C. § 553(b) (2012)).

something, that provision is, absent other affirmative indications, not mandatory. *E.g.*, *id.* at 1104.

The provisions cited are also procedural, not substantive rules. "[I]f a provision of an agency's personnel manual or handbook constitutes such a 'substantive rule,' it is far more likely to be considered a binding regulation for purposes of Tucker Act jurisdiction than if the provision were in the category of 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Id.* at 1105 n.6 (it is unclear which authority the circuit court was quoting). Although section 12 of Enclosure 14 lists reasons that removal from a QPL might be warranted, which are essentially substantive, the manual states only that "removal might be warranted." AR at 96. When considered as a whole, especially those provisions cited by plaintiff, DOD has not expressed an intent that these provisions be binding.[7]

We conclude that the DoD Manual is not a binding regulation. Nevertheless, as noted above, it is the standard the agency applied. As such, we consider, as part of our larger analysis of the rationality of the agency action, whether it met its own DoDM-stated goals in the process.

II.  The Process And Decision Were Reasonable

The procedures outlined for removal in DoDM are that, if a product or products are removed from the QPL, DLA must send "a written notice (registered, with a return receipt requested) of the action taken, the reasons for removal, and an opportunity to respond to that notice." DoDM 4120.24, Enclosure 14, § 12(b)(2). The letter of September 12, 2019, ticks each of those boxes. It gave Automatic notice of its removal from the QPL along with a list of 11 reasons for it, citing approved reasons for removal listed in Enclosure 14, § 12(a). It also cited section 12(b)(2) when stating that DLA was affording Automatic an opportunity to respond.

Automatic failed to avail itself of this opportunity. Now, in essence, it relies on those CARs, submitted before the notice of removal, as constituting its response. Or it argues, in essence, that no response was

---

[7] The final factor is whether the provision in question contravenes a statute. If it did, it could not have regulatory effect. That is not an issue here, however, as the manual is clearly promulgated pursuant to the Defense Standardization Act cited above.

necessary given its previously submitted CARs. We cannot agree. We find no arbitrary conduct nor any violation of the manual in the process followed by the agency and afforded to Automatic. Plaintiff's own decision not to respond to the removal notice cannot and does not establish any procedural omission on the part of the agency. The bona fides of the removal decision thus stand or fall on their own.[8]

Furthermore, even if the CARs submitted to DLA could somehow be considered a response to Automatic's removal from the QPL, DLA did take the CARs into consideration, contrary to Automatic's assertions. Plaintiff claims that DLA's memo supporting Automatic's removal from the QPL reveals that DLA did not review the CARs because the memo states that the "corrective actions are not effective as is demonstrated by the repeat findings that occur during subsequent audits." Pl.'s Mot. at 10 (quoting AR at 523). That is a mischaracterization of the memo, however. The memo is plain that DLA considered Automatic's corrective actions insofar as it did not believe that they would be effective. To support that assertion, the memo points to Automatic's past incidents, referencing past audits, stop shipments, and corrective actions that were not implemented, or at least no record of which could be produced to the auditor.[9] The DoDM, in fact, lists consideration of whether deficiencies in a product "reflect a repeated or continuing course of

_____

[8] To the extent that plaintiff argues that the notice was deficient by not affirmatively stating that Automatic's past failures to document or implement CARs was a basis for removal, we find no prejudice. Automatic was on notice of the issue based on the findings regarding that issue in the June 2019 Audit Report. *See* AR at 453. The cover letter to the CARs submitted in response to DLA, dated August 6, 2019, references the issue and even requests copies of documents from DLA. AR 460. Further, although inarticulate, there are two statements in the September letter that reference Automatic's conduct going back several years, which given the context provided by the Audit Report, informed plaintiff of this basis for removal. AR at 519-20 ("Automatic Conductor has engaged in a repeated and continuing course of conduct . . . . [F]or several years, Automatic Connector has ignored and circumvented VQ's authority as the qualifying activity.").

[9] Although not meaningfully treated by the parties, the Administrative Record also contains an array of correspondence regarding the 2016 findings, corrective actions, and stop shipment issues that lasted through 2018. Automatic had a stop shipment notice issued in July 2017, which was not lifted until October 2018. *See* AR 340 (stop shipment); AR 446 (release of stop shipment).

9

conduct" when deciding whether a product or products should be placed back on the QPL. DoDM 4120.24, Enclosure 14, § 12(b)(1).  DLA considered Automatic's CARs and reasonably believed, based on past actions, that the CARs would not be effective.

There is also no *per se* violation of the manual in DLA's decision not to put Automatic back on the QPL as contemplated by section 12(b)(1).  This provision states that "once the deficiencies noted have been corrected to the government's satisfaction," the product "should again be included on the electronic QPL."  There is no evidence that the government was satisfied that the deficiencies were or would be corrected to its satisfaction.  Further, as noted above, this language is not mandatory.  Even if the record suggested that the agency was satisfied with the CARs, this provision alone would not force the government's hand.

On the bona fides of the decision to remove, plaintiff takes no issue with the findings in the Audit Report.  Automatic challenges none of the reasons asserted in the notice or internal memo other than arguing that it did not have a problem with repeated failings.  Plaintiff argues that the first audit was mainly concerned with testing and the second with traceability issues.  That, notion, however, is belied by the record.  There were testing issues revealed by both audits.

We thus find no irrationality in the agency's finding that the problems were repeated.  That leaves plaintiff with only the argument that the agency's worries should have been allayed by its proposed corrective actions.  This argument we cannot entertain because it would require the court to second guess the agency's deliberative process.  We cannot do so.  That plaintiff disagrees or that a reasonable person might even come to a different conclusion is not enough.  The agency needs only a reasonable basis for its action.  We find that DLA's decision was informed.  It considered the relevant information, that information was correct, and DLA concluded in a valid exercise of its discretion to remove Automatic from the QPL.[10]  Nothing more is required in these circumstances.  The procedure afforded was likewise rational.

---

[10] It is also of no note that DLA did not discuss the issues or plaintiff's proposed response to them prior to removal.  The record is replete with correspondence during and after the audit process.  Notice was given and plaintiff did not avail itself of its final opportunity to respond.

CONCLUSION

Automatic has not shown procedural error or other irrationality in DLA's decision to remove it from the QPL.  Accordingly, plaintiff's motion for judgment on the administrative record (ECF No. 27) is denied. Defendant's motion for judgment on the administrative record (ECF No. 31) is granted.  The Clerk of the Court is directed to enter judgment for defendant. No costs.


s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

11